UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JODY P. BENDER, | ) | CASE NO. 3:17CV2709 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JACK ZOUHARY |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| NANCY A. BERRYHILL[1], | ) | |
| ACTING COMMISSIONER OF SOCIAL | ) | Report and Recommendation |
| SECURITY ADMINISTRATION, | ) | of Magistrate Judge |
| | ) | |
| Defendant. | ) | |

Plaintiff Jody P. Bender ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  ECF Dkt. #1. In her brief on the merits, Plaintiff asserts that the administrative law judge ("ALJ") erred by: failing to find that her hearing loss and diabetes were not severe impairments; violating the treating physician rule; improperly assessing her credibility; not accepting and including the reports concerning her having excessive absences and being off-task;  finding that she could perform work with accommodations; and finding that she could eat, check her blood sugar, and catheterize and irrigate her bladder with only two additional 15-minute breaks each day in addition to the customary breaks given to employees.  ECF Dkt. #14.

For the following reasons, the undersigned recommends that the Court REVERSE the decision of the ALJ and REMAND this case for re-evaluation of analysis of Dr. Cary's opinions as to Plaintiff's draining and irrigating of her bladder pouch.

## I.     FACTUAL AND PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI protectively on February 1, 2014, alleging disability beginning July 10, 2013 due to polycystic ovary syndrome ("PCOS"), diabetes, rare plasmacytoid tumor of the bladder, chronic back pain, right ear deafness, hematuria, hypertension,

---

[1]On January 20, 2017, Nancy A. Berryhill became the acting Commissioner of Social Security, replacing Carolyn W. Colvin.

mineral deficiency, and cognitive deficits.  ECF Dkt. #12 ("Tr.") at 369-401.[2]  The Social Security

Administration ("SSA") denied her applications initially and upon reconsideration.  *Id.* at 275-290.

Plaintiff requested a hearing before an ALJ, which was held on November 15, 2016. *Id.* at 133, 309-

315.  Plaintiff testified at the hearing with counsel present, and a vocational expert ("VE") testified

as well.  *Id.* at 133.

On February 13, 2017, the ALJ issued a decision denying Plaintiff's applications for DIB

and SSI.  Tr. at 108-126.  On December 29, 2017, Plaintiff filed the instant suit seeking review of

the ALJ's decision.  ECF Dkt. #1.  She filed a brief on the merits on April 25, 2018 and Defendant

filed her merits brief on July 3, 2018.  ECF Dkt. #s 14, 17.  On July 20, 2018, Plaintiff filed a reply

brief.  ECF Dkt. #19.

## II.    MEDICAL AND TESTIMONIAL EVIDENCE

### A.    MEDICAL EVIDENCE OF PHYSICAL IMPAIRMENTS

Plaintiff summarizes some of her physical challenges which began at birth.  ECF Dkt. #14

at 1-2.  She indicates that she was born six weeks early with the umbilical cord wrapped around her

neck several times and needed a tracheotomy due to the loss of oxygen that she suffered.  *Id.*  She

suffered some cognitive issues, as well as hearing loss in her right ear maybe related to an

underdeveloped ear.  *Id*. at 555.  It was noted that Plaintiff also had an asymmetrical face which

affected her speech to a mild degree.  *Id.*  She additionally has a type 2 diabetes mellitus diagnosis

and began treating for that condition on September 30, 2013 with Dr. Grego, her primary care

physician.  *Id*. at 1041. Dr. Grego noted that Plaintiff was compliant with her treatment "all of the

time" and she monitored her blood glucose 3-4 times per week.  *Id.*  Dr. Grego diagnosed Plaintiff

with diabetes, obesity, congenital hearing loss on the right, PCOS per report, recent hermaturia, and

a heart murmur.  *Id.* at 1042.   October 22, 2013 treatment notes from Dr. Grego indicated that

Plaintiff was compliant with her diabetic treatment "most of the time" and her weight was stable,

---

[2]All citations to the Transcript refer to the page numbers assigned when the Transcript was filed in
the CM/ECF system rather than when the Transcript was compiled.  This allows the Court and the parties to
easily reference the Transcript as the page numbers of the .PDF file containing the Transcript correspond to
the page numbers assigned when the Transcript was filed in the CM/ECF system.

but she followed a generally unhealthy diet and rarely exercised. *Id.* at 1045. January 23, 2014 notes from Dr. Grego indicated that Plaintiff's "[s]ugars are very good." *Id.* at 1085.

Medical records relating to her onset disability date of February 1, 2014 show that on February 14, 2014, Plaintiff presented to the emergency room complaining of left lower quadrant abdominal pain. Tr. at 628, 931. It was noted that she was 15 weeks pregnant and had a history of diabetes. *Id.* Her diagnoses were left groin pain, ligament pain and hematuria. *Id.* at 629. She was given Tylenol and told to follow up with her primary care doctor or gynecologist/obstetrician. *Id.* A bilateral renal ultrasound was also ordered due to the hematuria and pain and Plaintiff's history of kidney stones. *Id.*

On February 24, 2014, the renal ultrasound indicated that Plaintiff had a urinary bladder mass and a mildly enlarged right kidney with cortical thickness of uncertain etiology. Tr. at 635, 639. Further evaluation was recommended. *Id.*

On March 20, 2014, Plaintiff underwent a transurethral resection of a bladder tumor that was examined and turned out to be plasmacytoic variant bladder cancer. Tr. at 988-996. The surgeon indicated that the type of tumor that Plaintiff had was "a very aggressive tumor with overall poor outcomes." *Id.* at 988. She recommended removal of the tumor, but indicated that Plaintiff's situation was complicated because she was 22 weeks pregnant. *Id.* The surgeon recommended that Plaintiff have deeper biopsies in a month, she be monitored closely because she was still pregnant, and that she undergo aggressive management once she gave birth. *Id.* at 988.

On April 1, 2014, Plaintiff underwent a repeat transurethral resection to determine the extent of the malignancy. Tr. at 985. On April 2, 2014, Plaintiff presented to the emergency room complaining of difficulty urinating. *Id.* at 642. Dr. Grego diagnosed suspected urinary retention and told her to follow up with her primary care doctor. *Id.* at 645.

On May 23, 2014, Plaintiff presented to the emergency room due to vomiting over the past two days. Tr. at 650. Upon examination and testing, Plaintiff was diagnosed with acute diabetic ketoacidosis and she was admitted to the hospital for fetal monitoring, an insulin drip, and fluid hydration. *Id.* at 650-651. She was discharged on May 30, 2014 and adult home care was ordered

to help Plaintiff maintain stable blood sugars and to follow the prescribed dietary restrictions to stabilize her blood sugars. *Id*. at 675-682.

In July 2014, Plaintiff delivered her baby by C-section and was having trouble controlling her glucose after giving birth. Tr. at 728. In August 2014, Plaintiff had a wound abscess and wound disruption from her incision site and she received treatment. *Id*. at 759.

On August 12, 2014, Plaintiff presented to Dr. Grego for follow up of her type 2 diabetes mellitus. Tr. at 1056. He noted that Plaintiff's disease course had been stable and she had no diabetes-associated symptoms. *Id.* Dr. Grego indicated that Plaintiff was compliant with diabetes treatment "most of the time," and her weight was stable, but she had a generally unhealthy diet as she did not meal plan and she exercised only intermittently. *Id.* He diagnosed Plaintiff with diabetes, being overweight, and tinea pedis. *Id.* at 1057. He encouraged healthy eating and exercise. *Id.*

On August 15, 2014, Dr. Cary, a urologist at University Hospital, wrote a letter to Dr. Grego, indicating that he examined Plaintiff, who was 4 weeks post-partum, and she indicated that she was doing well despite having an emergency C-section. Tr. at 976. Dr. Cary indicated that usually Plaintiff's type of bladder tumor is treated aggressively up front, but because of her pregnancy, and despite the cystoscopies, she had a very high risk of developing metastatic disease. *Id.* at 977. He suggested additional testing. *Id*.

After additional testing, Plaintiff underwent a radical cystectomy (removal of the bladder) with Indiana pouch urinary diversion, total abdominal hysterectomy, mobilization of omental flap into the pelvis, a limited sampling of retroperitoneal lymph nodes, and an extended pelvic lymph code dissection on September 15, 2014. Tr. at 965-969. She was discharged from the hospital on September 22, 2014. *Id.* at 962.

On October 10, 2014, a renal and urinary bladder ultrasound that was compared with the prior ultrasound showed that Plaintiff still had left renal atrophy which was unchanged from the prior testing. Tr. at 960. The Indiana pouch was grossly unremarkable. *Id*.

Dr. Cary wrote a letter to Dr. Grego on October 10, 2014 indicating that the pathology from Plaintiff's surgery showed no residual disease and her lymph nodes were also negative. Tr. at 958. He explained that Plaintiff had some incisional issues due to her obesity and Plaintiff indicated that

-4-

she had some issues with the catheter and drainage. *Id.*  Dr. Cary noted that upon examination, he noticed a couple areas in the lower part of her incision that were open and they were being packed. *Id.*  He indicated that he performed a pouchogram and removed the catheter based upon the results. *Id.*  He stated that he discussed with Plaintiff how to intermittently catheterize through her channel. *Id.*  He informed Dr. Grego that Plaintiff was catheterizing herself well and she needed to continue changing her dressing on the wounds 2-3 times per day. *Id.* at 958-959.  He notified Dr. Grego that Plaintiff would be following up with him in a couple of weeks. *Id*. at 959.

Dr. Cary wrote another letter to Dr. Grego on October 16, 2014 indicating that he had removed the staples from Plaintiff's wound and debrided it. Tr. at 956.  He noted that Plaintiff had a blister at the top of her incision that he opened and then packed with Iodoform. *Id*. He also indicated that Plaintiff had three small open portions on her incision, which were continuing to be packed with dressing changes twice per day. *Id.*  He explained that he told Plaintiff to continue her catheterizations and with changing the dressings twice per day. *Id.*

Dr. Cary wrote another letter on November 21, 2014 informing Dr. Grego that Plaintiff had a CT scan which showed some right-sided hydronephrosis, but no evidence of disease. Tr. at 953.  He noted that Plaintiff reported that she catheterized herself every 5 hours and the wound appeared well-healed. *Id*. at 954.  He indicated that he did another pouchogram as Plaintiff reported seeing food particles in her catheter, but he believed that the particles were mucus and he told her to continue to irrigate in order to get the mucus out. *Id*.  Dr. Cary also noted that Plaintiff reported being off balance, but she denied vision changes or motor or sensory deficits. *Id*.  He explained that because of the aggressiveness of the type of cancer that Plaintiff had, he ordered a brain MRI. *Id.*

Dr. Grego examined Plaintiff on February 5, 2015 due to low hemoglobin. Tr. at 1064.  He diagnosed anemia, a prior confirmed diagnosis of bladder cancer, and fatigue. *Id.*

Dr. Muler examined Plaintiff at the request of Dr. Grego for her anemia on February 13, 2015. Tr. at 817, 821. He diagnosed Plaintiff with microcytic anemia and hypochromia, which were consistent with an iron deficiency. *Id*.  He indicated that Plaintiff was not absorbing iron very well, which was a phenomenon in diabetics, could be due to a small bowel diversion during surgery, or part of her pregnancy. *Id*. He recommended an IV of iron. *Id.*

A CT of the chest on February 11, 2015 showed several scattered small bilateral lung nodules. Tr. at 948. Dr. Cary wrote to Dr. Grego on the same date and indicated that he examined Plaintiff and she was having problems with continued mucus in her urine and inadequate drainage of her pouch. *Id.* at 946, 1180-1181. He noted that she also had low hemoglobin, but Dr. Grego referred Plaintiff to an oncologist for this issue. *Id.* Dr. Cary indicated that upon examination, and CT scans of Plaintiff's chest, abdomen, and pelvis taken that day, he saw no recurrence of cancer. *Id.* He performed another pouchogram and did not see any evidence of a fistula between her pouch and her GI tract. *Id.*

A May 19, 2015 CT of the chest showed no new and otherwise stable pulmonary nodules and no suspicious mediastinal adenopathy. Tr. at 944. A CT of the abdomen compared with prior abdomen CTs showed persistent hetergeneous perfusion of the right kidney that was similar to the prior CT and most likely due to chronic pyelonephritis with scarring, stable appearance of the atrophic left kidney with significant hydronephrosis, which had increased since the last CT, and several calcific densities which were most likely stones. *Id.* at 942. The current CT showed that the pouch was unremarkable, post-cystectomy changes occurred but without evidence of tumor recurrence, and there were unchanged mildly prominent retropertoneal lymph nodes, likely reactive, but nodal metastases was not excluded. *Id.*

Also on May 19, 2015, Dr. Cary again wrote to Dr. Grego, indicating that he had examined Plaintiff and had her drink activated charcoal, and examined a urine sample and conducted a cystoscopy. Tr. at 939. Dr. Cary stated that based upon testing, he believed that Plaintiff had a fistula of reasonable size that was allowing food particles to get inside of her pouch and conservative treatment would not help to heal it. *Id.* at 940. He recommended that Plaintiff undergo a laparatomy and a possible bowel resection and anterior abdominal wall repair. *Id.*

On June 15, 2015, Plaintiff underwent an exploratory laparatomy, an extensive enterolysis and adhesiolysis, takedown of colo-urinary pouch fistula with primary fistula closure to urinary reservoir, a dissection of ileocolostomy with primary hand-sewn anastemosis, omental pedicle flap to pouch fistula closure, abdominal wall component separation with development of myofascial advancement flaps, repair of abdominal incisional hernia with primary fascial closure, and complex

-6-

multilayer abdominal wound closure. Tr. at 1035-1038, 1126-1172. She was discharged from the hospital on June 24, 2015. *Id.* During her stay, Plaintiff received physical therapy in preparation for discharge, and it was recommended that Plaintiff have 24-hour home assistance from her family. *Id.* at 1149. She was also prescribed home skilled nursing visits to help her with her drain and she was shown how to care for her foley catheter, flusher and urinary reservoir pouch, and how to check her blood sugars three times per day. *Id.*

On June 29, 2015, Plaintiff presented to the emergency room complaining of problems with her catheter. Tr. at 1035. Leakage of urine was noted around the catheter and when emergency room personnel irrigated, something that looked like a piece of corn came out and the bladder began to drain and the issue seemed to be resolved. *Id.* When the emergency room physician called the physician on-call for Dr. Grego, he indicated that this was not entirely unexpected given Plaintiff's prior fistula and was likely a remnant of the prior fistula rather than a new one. *Id.* at 1036. Plaintiff was diagnosed with catheter malfunction and irrigation and discharged. *Id.*

After reviewing her file, agency physician Dr. Freihofner found on June 11, 2015 that Plaintiff could perform light work with additional limitations of breaks every four hours to drain her bladder bag, occasional climbing of ladders, ropes and scaffolds, a quieter work environment to accommodate her hearing loss, and the avoidance of concentrated exposure to noise, and all hazards, such as machinery. Tr. at 209-210.

On July 3, 2015, Plaintiff presented to the emergency room to have her wound checked. Tr. at 1031-1032. A small wound opening was noticed with no obvious drainage or necrosis and no evidence of cellulitis. *Id.* Plaintiff was told to follow up with her surgeon. *Id.*

Dr. House, the general surgeon, wrote Dr. Grego a letter dated July 6, 2015 informing him that he did a wound check and postoperative visit on Plaintiff. Tr. at 1122, 1274-1275. Plaintiff complained of a wound separation. *Id.* Dr. House stated that he removed Plaintiff's in-dwelling catheter and all of the surgical staples at this visit, and the wound separation did not look infected. *Id.* He noted that he prescribed Keflex to Plaintiff and told her to continue catheterizing herself every 2-3 hours and maintain her pouch decompressed to avoid further complications. *Id.*

Dr. House examined Plaintiff on July 22, 2015 and indicated that Plaintiff was doing

reasonably well and had no issues concerning her pouch.  Tr. at 1118, 1274-1275.  He noted that she had a bit of cellulitis above the upper wound edges and therefore continued to be devascularized without heavy colonization.  *Id*.  He did a debridement and cleansed the wound area.  *Id*.  He put Plaintiff on Keflex for the cellulitis, told Plaintiff to shower at least once a day and irrigate the wound with the  showerhead, and to do a dressing change twice per day.  *Id*.

In a July 22, 2015 letter to Dr. Grego, Dr. Cary indicated that Plaintiff had an operation to repair an incisional hernia and takedown of the fistulous connection between her bowel and the pouch.  Tr. at 1120, 1274-1275.  Dr. Cary further noted that Plaintiff was receiving iron infusions for anemia.  *Id*.  Plaintiff reported that her catheterizations and irrigations were going well and she had not observed any food particles like she had before.  *Id*. at 1121.  Dr. Cary's examination showed that Plaintiff had small open areas in her midline incision with no infection.  *Id*.  He ordered a CT scan and was awaiting results, and he wanted to schedule a chest, abdomen and pelvis CT, and blood work and urine cytology at her next 3-month visit.  *Id*.  Plaintiff followed up with Dr. House on July 22, 2015 for her wound, and cellulitis was noted above the upper portion of the wound's edges.  *Id*. at 1118, 1272-1273.  Plaintiff was given antibiotics.  *Id*.

Plaintiff presented again to the emergency room on July 27, 2015 due to chills and an open postoperative wound.  Tr. at 1025.  The wound was cultured, Plaintiff was given Bentyl for abdominal cramping, and she was put on Bactrim.  *Id*.

On August 12, 2015, Plaintiff presented to Dr. House for a wound check.  Tr. at 1115.  He opened the wound to facilitate VAC placement so she could receive VAC therapy for 6 weeks.  *Id*. at 1117, 1269-1271.  August 25, 2015 treatment notes indicated that Plaintiff had new development of infraumbilical panniculitis secondary to seroma.  *Id*. at 1111, 1266-1268.  Her wound was drained and packed.  *Id*. at 1111-1113.

Plaintiff had her wound checked again on September 16, 2015 and it was indicated that there were no ongoing complications and her wounds were fully healed.  Tr. at 1109, 1263-1265.

On October 12, 2015, agency reviewing physician Dr. Teague opined that Plaintiff could perform light work with the additional restrictions of breaks every 4 hours to drain her bladder bag,

never climbing ladders, ropes or scaffolds, a quieter work environment to accommodate her hearing loss, and the avoidance of concentrated exposure to noise and to all hazards.  Tr. at 247.

On October 23, 2015, Dr. Cary wrote to Drs. Grego and House and indicated that Plaintiff told him that her catheterizing and irrigating were going well.  Tr. at 1261.  She stated that she saw no debris in her urine, so he believed that the fistula problem had resolved.  *Id.*  He noted that Plaintiff underwent CT scans of her chest, abdomen, and pelvis, and her left kidney was quite small and provided less overall renal function and she had a stone in the lower pole and in the proximal ureter causing some hydro and stranding around the kidney.  *Id.*  They also discussed thickened areas upon around her left adrenal gland and how it was uncertain if this was due to the kidney issue or if it was a metastatic site of disease.  *Id.*  She also had pleura effusion on the left side of her lung.  *Id.* He told the doctors that Plaintiff confirmed left-sided pain over the last few weeks.  *Id.* at 1261-1262.  Dr. Cary indicated that he was going to present Plaintiff's case to the tumor board and see if they consented to him proceeding to tap the pleural effusion and/or biopsy the adrenal gland.  *Id.* at 1262.  He indicated that Plaintiff may need a percutaneous nephrolithectomy for the stone, but they had to figure out if she had a cancer recurrence first.  *Id.*

On December 31, 2015, Plaintiff underwent a left percutaneous nephrolithotomy for her left renal stone.  Tr. at 1199.

On January 8, 2016, Dr. Cary wrote Dr. Grego indicating that he saw Plaintiff to remove her left nephrostomy tube.  Tr. at 1201.  He noted that at her last visit, a CT scan showed stranding above the left kidney and a left pleural based effusion.  *Id.*  He indicated that the pleural effusion was tapped and it did not show any cancer cells, and her left adrenal gland was biopsied and also showed no cancer.  *Id.*  Dr. Cary explained that he therefore went ahead and did the left percutaneous nephrolithotomy and Plaintiff had been home for about a week with the nephrostomy tube clamped.  *Id.*  A left antegrade nephrostogram showed good drainage with no defects.  *Id.*

Plaintiff saw Dr. Grego on March 15, 2016 and she reported that she could not tolerate the increased dosage of Metformin that had been prescribed, so he ordered a lesser dosage.  Tr. at 1300.

In a March 18, 2016 letter to Dr. Grego, Dr. Cary indicated Plaintiff had a chest CT and it showed no cancer, she had a biopsy of the left adrenal gland and it appeared normal, the stone in her

-9-

left kidney was removed, and the pleural effusion was gone. Tr. at 1203. Dr. Cary reported that Plaintiff was doing well and had no complaints about the catheterizations. *Id.* He reviewed the results from the blood tests and wanted to start her on B12 replacement therapy. *Id.*

On September 7, 2016, Plaintiff presented to a family practice nurse practitioner for a follow up diabetic visit and Plaintiff reported that her disease was stable, she had no fatigue, and her symptoms were stable. Tr. at 1344. However, she reported that she was compliant with her treatment "none of the time." *Id.* She indicated that she had not taken her Metformin for a few months because she forgot. *Id.* She also stated that she did not check her blood sugar regularly. *Id.* Blood tests were performed. *Id.* at 1346. Plaintiff's glucose, BUN, and creatinine were high. *Id.* at 1341-1342. Compliance with medication was discussed. *Id.* at 1344.

On September 8, 2016, Dr. Cary completed a work restriction report for Plaintiff and indicated that Plaintiff could sit for up to 4 hours at a time, stand up to 3 hours at a time, and walk up to 1 hour at a time per 8-hour workday. Tr. at 1217. He further opined that Plaintiff could sit for a total of up to 8 hours, stand for a total of up to 4 hours, and walk for a total of up to 3 hours per 8-hour workday. *Id.* Dr. Cary further indicated that Plaintiff did not need to change positions, she would not have to leave her work station to move about and stretch, and she would not likely miss 3 or more days of work per month due to exacerbations. *Id.* He opined that Plaintiff would occasionally, have to leave the work station to use the restroom, up to 6 times per shift, in addition to regularly scheduled breaks. *Id.* He placed no weight restrictions for lifting and carrying objects, and he indicated that her pain was mild. *Id.*

Plaintiff presented to Dr. Grego on September 23, 2016 and was diagnosed with a heart murmur, diabetes, obesity, renal insufficiency, and anemia. Tr. at 1355. Plaintiff indicated that she had been looking for a job but could not find one. *Id.* She reported some pain, but she was attempting to walk to improve her fitness and was controlling her sugar. *Id.*

On September 23, 2016, Dr. Grego completed a work restriction report and attached a letter concerning work restrictions for Plaintiff. Tr. at 1280-1281. Dr. Grego indicated in his letter that Plaintiff had recovered from her extensive surgeries and she had recovered physically as well. *Id.* at 1281. Part one of the work restriction form asked Dr. Grego to indicate Plaintiff's abilities to sit,

-10-

stand, and walk during an 8-hour workday, both for a total at one time and for a total during the entire workday. *Id.* at 1280. On the form, Dr. Grego left this section blank and referred to his attached letter. *Id.* On the second section of the form, Dr. Grego answered that Plaintiff did not need to change positions, she would not have to leave her station in order to stretch or move about, and she would not miss 3 or more days per month due to exacerbations. *Id.* He further opined that Plaintiff would rarely need to leave a work station in order to use restroom facilities in addition to regularly scheduled breaks. *Id.*

In his accompanying "To Whom it May Concern," letter, Dr. Grego stated the following:

> Her limitations would be consistent with anyone who is not in good physical condition. She currently does not have problems with chronic pain and only occasionally uses pain medicine. She only needs to drain her bladder pouch every 3-5 hours and needs to irrigate this every 8 hours. She has not had any recent flare ups of underlying medical conditions and there is no way to predict if she will have problems. Regarding her ability to lift and carry would limit this to 20 pounds as anything heavier would most likely cause an over use type problem. Her greatest limitation seems to be a lack of vocational training.

Tr. at 1281.

On November 8, 2016, Plaintiff presented to Dr. Abidi for a nephrology consultation at the request of Dr. Grego for her elevated creatinine level. Tr. at 1378. Based upon lab results and his physical examination, Dr. Abidi diagnosed Plaintiff with elevated serum creatinine and indicated that her creatinine had risen from .5-1.5 over a period of two years, which showed a rapid decline in renal function. *Id.* at 1383. He believed that the decline was too rapid to be diabetic neuropathy and he questioned whether it was chronic interstitial nephritis due to reflux caused by ileal conduit versus recurrent episodes of acute renal failure, or obstructive uropathy. *Id.* He indicated that Plaintiff's hypertension was under reasonable control, but her diabetes mellitus was poorly controlled. *Id.* He ordered comprehensive urine testing and a check of the renal ultrasound. *Id.* The renal ultrasound showed an atrophic left kidney and a normal right kidney. *Id.* at 1385.

On November 21, 2016, Dr. Grego completed a Work Restriction Report indicating that during an 8-hour workday, Plaintiff would have to be given a break in order to check her blood sugars 2 times, which required a clean facility and approximately 15 minutes. Tr. at 1375. He

also indicated that during an 8-hour workday, Plaintiff would have to eat 1-3 times per day and would need 10-30 minutes once she reached the lunchroom or cafeteria. *Id.*

### B. MEDICAL EVIDENCE OF PSYCHOLOGICAL IMPAIRMENTS

On September 21, 2012, Dr. Shamberg, Ph.D., evaluated Plaintiff at the request of the agency for her claim of mental disability benefits. Tr. at 1207. Plaintiff had a driver's license and reported that she had worked for 5 seasons at Campbell's Soup Company packing cans, but the company instituted a test and she had failed it 5 times. *Id.* She explained that the company wanted $75 for each time that she took the test and she did not understand what was wrong with her. *Id.*

Plaintiff reported that she graduated from high school in special education classes and had been married once, but was divorced and living with her boyfriend. Tr. at 1208. She last worked for Campbell's Soup in 2009 and had not worked since. *Id.* Plaintiff explained that she was able to read, but she had problems understanding "the big words." *Id.* She reported being in good health, except she was not able to hear from her right ear. *Id.* Dr. Shamberg reported that Plaintiff was able to hear all questions that he asked of her. *Id.*

Upon evaluation, Dr. Shamberg noted that Plaintiff had logical, coherent, and goal-directed speech, but her pace of mentation was often slow. Tr. at 1209. He performed intelligence testing and found that she was in the low end range of borderline intellectual functioning ("BIF"). *Id.* at 1211. He diagnosed her with BIF, depressive disorder and anxiety disorder, not otherwise specified. *Id.* He assigned her an overall global assessment of functioning score of 45, indicative of severe symptoms. *Id.* Dr. Shamberg opined that Plaintiff had moderate limitations in understanding, remembering and carrying out instructions and he noted her difficulty in doing so if instructions are presented in written form or on a computer because she had reading comprehension problems. *Id.* at 1212. He further opined that Plaintiff had "not many limitations" in maintaining attention and concentration during the long interview, but she would have moderate to severe limitations in job persistence and keeping up pace, especially with multi-step tasks. *Id.* He opined few, if any, problems with responding appropriately to supervisors and co-workers based upon Plaintiff's prior work reports, and he indicated that Plaintiff would have slight to moderate limitations in responding appropriately to work pressures in competitive-type factory work. *Id.* at 1213. As to managing her

-12-

own benefits if granted, Dr. Shamberg indicated that Plaintiff would "barely" be able to manage them. *Id*. at 1212.

On July 23, 2015, Dr. Shamberg again examined Plaintiff at the request of the agency. Tr. at 1009. He noted Plaintiff's chief complaint was her bladder cancer and having to drain her new bladder every 4 hours, which took 25 minutes each time or even longer, and having to irrigate her bladders 2 times per day to flush and prevent infections. *Id*. She also referenced several hospitalizations and health problems. *Id*. Plaintiff indicated that she was married and lived with her husband, their 1 year-old son, and her grandmother. *Id*. at 1010. She reported that she was depressed sometimes, but she was not on any antidepressant medications and was not undergoing any counseling or therapy. *Id*. at 1012. She had a phobia that she would get cancer again and she had some fear of crowded public places. *Id*. As to her cognitive functioning, Dr. Shamberg referenced his prior report indicating that Plaintiff was functioning in the bottom range of BIF. *Id.* He also indicated that Plaintiff's judgment as to her cognition was moderately impaired. *Id*. at 1013.

Dr. Shamberg diagnosed Plaintiff with adjustment disorder with mixed anxiety and depressed mood, specific phobia of cancer returning, and low end BIF. Tr. at 1013. He opined that if Plaintiff received disability benefits, she would be able to manage her funds, but at times just barely so. *Id*. at 1014. He also opined that while Plaintiff's anxiety and depression would not present major limitations as to Plaintiff's abilities to understand, remember, and carry out simple job instructions, her BIF and reading comprehension problems would be problematic in understanding, remembering and executing many job instructions. *Id.* Dr. Shamberg indicated that Plaintiff's abilities to maintain attention and concentration, persistence and pace, and to perform simple and multi-step tasks were no problem at the evaluation, but could present problems with other people and distractions on a job. *Id.* at 1015. He opined that Plaintiff was often slow at responding due to reactive depression, and on some jobs. she may have problems keeping pace and persistence. *Id.* He also indicated that Plaintiff may have some limits in responding appropriately to supervisors and co-workers, and her depression, anxieties and bottom end borderline intellectual range may present "fairly significant limitations" in responding appropriately to work pressures. *Id.*

-13-

Agency reviewing consultant Dr. Haskins, Psy.D. reviewed the record on July 2, 2015 and found that Plaintiff was not significantly limited in: remembering locations and work-like procedures; understanding, remembering, and executing very short and simple instructions; performing activities within a schedule, maintain regular attendance or being punctual; maintaining socially appropriate behavior and adhering to basic standards of cleanliness; being aware of normal hazards and taking appropriate precautions.  Tr. at 211-213.  Dr. Haskins found no evidence of limitation in Plaintiff's abilities to: sustain an ordinary routine without special supervision; make simple, work-related decisions; ask simple questions or request assistance; travel in unfamiliar places or use public transportation; or in setting realistic goals or making plans independently of others.  *Id.*  She further opined that Plaintiff had moderate limitations in the abilities to: understand, remember and carry out detailed instructions; maintain concentration and attention for extended periods; work in coordination with or in proximity to others without being  distracted by them; complete a normal workday or workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number of rest periods; interact appropriately with the public; accept instructions and respond appropriately to criticism from supervisors; and get along with co-workers or peers without distracting them or exhibiting behavioral extremes.  *Id.*  Dr. Haskins concluded that Plaintiff was  moderately restricted in her daily living activities, and in her abilities to maintain social functioning and her concentration, persistence or pace.  *Id.* at 224.  Dr. Haskins opined that Plaintiff could attend and concentrate in a work setting with simple, short cycle tasks, at most moderate pace demand and where she can work away from others or have occasional, superficial interactions.  *Id.* at 228-229.

Upon reconsideration of her claim, Dr. Lai made nearly the same limitation findings as Dr. Haskins, except that she opined that Plaintiff could maintain attention, make simple decisions, and adequately adhere to a schedule to complete simple, short cycle and repetitive tasks at a moderate pace, in a setting without high production demands, and where she could work away from others and with tasks that did not require teamwork to complete.  Tr. at 247-248.

-14-

### C.    TESTIMONIAL EVIDENCE

Plaintiff testified before the ALJ on November 15, 2016 with counsel present.  Tr. at 144. She indicated that she had a driver's license and drives, but not long distances.  *Id.* at 145.  She stated that her husband drives long distances, like the 3-hour drive to see her doctor, and she has no trouble riding in the car for 3 hours.  *Id.*

Plaintiff indicated that she was in special education classes in school because she has a learning disability, although she can read and write, make change, manage a checking account, and she can add and subtract.  Tr. at 145-146.  She also had vocational training as she was given some training on how to drive a forklift.  *Id.* at 147.

When asked why she stopped working, Plaintiff explained that it was because she had her son, then had bladder cancer, surgeries, and all of the appointments after that.  Tr. at 148.  She also indicated that she tried to find a job, but at the only interview she had, they told her that they did not need her because of her surgeries and all of the things that she had to do to irrigate and drain her bladder.  *Id.*  She said that the last time she worked, she loved it.  *Id.*  The last time that she applied for a job was the month before the hearing. *Id.*  They then reviewed her prior employment, including her job at Campbell's Soup from 2005-2009, where she lifted about 25 pounds and was on her feet during the entire shift on an assembly line.  *Id.* at 150-160.  She explained that she could not return to Campbell's after 2009 because they imposed some kind of test and she took the test 3 or 4 times and could not pass it and the company then wanted to charge her money to take the test and she could not afford it.  *Id.* at 175.  She indicated that the test had a lot of math on it and her sisters and brother all passed, but she could not.  *Id.* at 176.

When the ALJ asked Plaintiff why she could not work, Plaintiff testified that she has to irrigate her bladder about 4-5 times per day, which takes about 20 minutes each time as she has to drain her bladder pouch and irrigate it and the catheter to flush them out.  Tr. at 161.  She further indicated that she needs a place to store all of her equipment and she needs someone to help her with this procedure, as her husband, grandmother or sister helps her at home because she has to hold the catheter in place while someone puts the fluids in and draw them back out for flushing.  *Id.* at 162-

164. Plaintiff elaborated that she drains the bladder pouch every 3-5 hours and she irrigates 3 times per day. *Id*. at 167.

Plaintiff further testified that her grandmother comes over to help her watch her 2 year-old son. Tr. at 169. She also discussed her right ear deafness, her blood pressure, which was stable on medication, and her diabetes, which she reported was not stable with medication, but doctors were working on it. *Id*. at 169-171. Plaintiff reported no complaints of pain, no recent hospitalizations, and no mental health issues for which she was receiving treatment. *Id*. at 171-175. She described a typical day a waking up, taking a shower, eating breakfast or making breakfast for everyone, packing her husband's lunch, playing with her son, going to her grandma's and walking with her, going shopping for groceries, going home and playing with her son again, cleaning the house, and making dinner. *Id*. at 176-177. Plaintiff estimated that she could lift up to 25 pounds, she could walk all day, she could stoop, kneel, crouch, crawl and bend, but she loses her balance. *Id*. at 179-180. She testified that either her mom or grandmother usually go grocery shopping with her because she tends to buy things she should not if she goes alone, like candy. *Id*. at 181.

The ALJ then questioned the VE, asking her to assume a hypothetical individual with Plaintiff's age, education and vocational background, with a light work level and restrictions of: no climbing of ropes or scaffolds; simple, routine and repetitive tasks, but not at a production-rate pace, like no assembly line work; simple, work-related decision-making; occasional interaction with supervisors, co-workers and the public; few changes in the work setting, meaning routine job duties performed in a predictable work setting with any necessary changes occurring infrequently and being adequately and easily explained. Tr. at 185. The VE responded that such a hypothetical individual could not perform any of Plaintiff's past relevant work, but could perform the jobs of housekeeper/cleaner, hand gluer, photocopy machine operators, all of which existed in significant numbers in the national economy. *Id*. at 185-186.

The ALJ modified the hypothetical individual, including 2 extra bathroom breaks per 8-hour workday, with access to a restroom near the work station, and this individual would remain on-task 90% of the day. Tr. at 186-187. The VE responded that the prior 3 jobs that existed in the national economy would remain with this additional limitation. *Id*. at 187.

-16-

The ALJ again modified the hypothetical individual, adding frequent hearing.  Tr. at 188.  The VE responded that all 3 jobs still remained.  *Id.*  The ALJ then modified the exertional level to that of sedentary with all of the prior limitations.  *Id.*  The VE testified that the jobs of document addresser, inspector positions, and final assembler positions would be available in significant numbers in the national economy for such a person.  *Id.*

When asked to testify about standard breaks, time on-task and unplanned absence tolerance of employers, the VE indicated that standard breaks are a 10-15 minute break in the morning and afternoon, and a 30 minute lunch break.  Tr. at 189.  She further explained that no more than 1 absence per month is tolerated on an ongoing basis, including arriving late and/or leaving early, and a worker would have to be on-task 90% of the time.  *Id.*

Plaintiff's counsel asked the VE to add a limitation to moderate noise levels, and the VE indicated that the hand gluer job would be eliminated.  Tr. at 193-194.  Counsel further added that the hypothetical individual would have to work away from others, not performing tandem tasks or working in proximity to others.  *Id.* at 194.  The VE responded that no jobs would be available if the person had to work in isolation, as all of the identified jobs required working in tandem.  *Id.*  The VE also responded that none of the identified jobs required more than superficial interactions, or more than simple, short-cycle repetitive tasks.  *Id.* at 195.  The VE answered that no jobs would be available if a restriction was added that repetition of job instructions would be necessary beyond the specific vocational preparation that was needed.  *Id.*  She further answered that no jobs would be available if the hypothetical individual also needed to use the restroom up to 6 times per shift, in addition to regularly scheduled breaks, if this went beyond the 10% off-task figure.  *Id.* at 196.

### III.    SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION

In her February 13, 2017 decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant time period, and since that date, Plaintiff had the severe impairments of: bladder cancer, affective disorders, depression, anxiety disorders, and borderline intellectual functioning.  Tr. at 113.  She found that Plaintiff's impairments of right ear hearing loss, hypertension, hyperlipidemia, diabetes, history of iron deficiency and anemia, infections, abscesses, cellulitis, incisional hernia, and back pain were not severe impairments.  *Id.* at 114.

-17-

The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Subpart P, Appendix 1. Tr. at 115-117. After considering the record, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work with the following limitations: never climbing ropes or scaffolds; simple, routine, repetitive tasks, but not at a production rate pace, such as no assembly line work; making simple, work-related decisions; responding appropriately to occasional interaction with supervisors, co-workers, and the general public; tolerance to only a few changes in the work setting, defined as routine job duties that are performed in a predictable work setting, with necessary changes occurring infrequently and with adequate explanation and which are easily explained; and 2 extra bathroom breaks per day, remaining on task 90% of the day despite these 2 extra breaks, with access to a bathroom near the workstation. *Id.* at 117.

Based upon Plaintiff's age, education, background, the ALJ's RFC, and the VE's testimony, the ALJ determined that Plaintiff could not perform her past relevant work, but she could perform jobs existing in significant numbers in the national economy, such as the jobs of housekeeper cleaner, hand gluer, and photo copy machine operator. Tr. at 125. In conclusion, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, and she was not entitled to DIB or SSI from February 1, 2014, through the date of her decision. *Id.* at 126.

**IV.     STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits. These steps are:

1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.  An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see  20 C.F.R.  § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

-18-

4.      If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.      If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.      STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted).  Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance."  *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007).  Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found Plaintiff disabled.  *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).  The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001).  However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where

the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (internal citations omitted).

## VI.    LAW AND ANALYSIS

### A.    STEP TWO- HEARING LOSS AND DIABETES

Plaintiff asserts that the ALJ erred by failing to find that her hearing loss and diabetes were severe impairments. ECF Dkt. #14 at 15-17. For the following reasons, the undersigned finds that the ALJ applied the proper legal standards at Step Two and substantial evidence supports her determination that Plaintiff's hearing loss and diabetes were not severe impairments.

At step two of the sequential steps for evaluating entitlement to social security benefits, a claimant must show that he or she suffers from a severe medically determinable physical or mental impairment. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is not considered severe when it "does not significantly limit [one's] physical or mental ability to do basic work activities." 20 C.F.R. §404.1521(a). At step two, the term "significantly" is liberally construed in favor of the claimant. The regulations provide that if the claimant's degree of limitation is none or mild, the Commissioner will generally conclude the impairment is not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities." 20 C.F.R. §404.1520a(d). The purpose of the second step of the sequential analysis is to enable the Commissioner to screen out "totally groundless claims." *Farris v. Sec'y of HHS*, 773 F.2d 85, 89 (6th Cir.1985). The Sixth Circuit has construed the step two severity regulation as a "*de minimis* hurdle" in the disability determination process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.1988). Under a Social Security policy ruling, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ is required to treat it as "severe." SSR 96-3p (July 2, 1996).

Once the ALJ determines that a claimant suffers a severe impairment at step two, the analysis proceeds to step three; any failure to identify other impairments, or combinations of impairments, as severe in step two is harmless error. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir.1987) Once a claimant clears Step Two of the sequential analysis, the ALJ is required to consider all of his or her impairments, severe and non-severe, at every subsequent step of the

sequential evaluation process. *See Anthony v. Astrue*, 266 Fed. App'x 451, 457 (6th Cir. 2008)(ALJ's failure to identify an impairment as severe was "legally irrelevant" because the ALJ found other impairments to be severe at Step Two, which allowed the ALJ to consider all impairments in the later steps in the process).

In this case, Plaintiff acknowledges that an ALJ's finding of at least one impairment as severe at Step Two generally renders her failure to identify other severe impairments legally insignificant.  ECF Dkt. #14 at 15, citing *Doriot v. Comm'r of Soc. Sec.*, No. 3:11CV1648, 2012 U.S.Dist. LEXIS 122632 (N.D. Ohio Aug. 8, 2011), citing *Maziarz,* 837 F.2d at 244 and *Anthony*, 266 Fed. App'x at 457.  However, Plaintiff asserts that not only did the ALJ in her case erroneously find that her hearing loss and diabetes were not severe impairments, the ALJ also failed to consider these impairments at any further step in the sequential evaluation process.  ECF Dkt. #14 at 16-17. She contends that two doctors opined that her hearing loss required her to work in a quieter environment and the ALJ failed to adopt these opinions and instead found that her hearing loss was not severe because she had no trouble understanding a conversational level at the ALJ hearing.  *Id.* at 16.   Plaintiff is correct that the ALJ found her hearing loss to be non-severe at Step Two.  Tr. at 114.  In doing so, the ALJ cited to the regulations and Social Security Rulings concerning Step Two and she explained that Plaintiff had no problem hearing their entire conversation at the hearing and responding appropriately.  *Id.*  She also noted that Plaintiff testified at the hearing that she could read lips and had been doing so since she was 14 years old.  *Id.*  The ALJ also explained that Plaintiff was able to hear, understand, and respond at the lengthy psychological evaluation, and she found that the evidence failed to show that a hearing aid could remedy her hearing loss or that the hearing loss presented more than a minimal limitation.  *Id.*  Based upon review of the ALJ's Step Two analysis, the undersigned recommends that the Court find that the ALJ employed the proper legal standards in determining that Plaintiff's hearing loss was not a severe impairment and substantial evidence supports her Step Two finding.  Plaintiff fails to demonstrate that her hearing loss caused more than minimal limitations since she testified that she had no trouble hearing the ALJ, the agency psychologist repeatedly noted that Plaintiff was able to hear him at his evaluation, and Plaintiff

worked at Campbell's Soup on the assembly line in three different departments for five years and did not report significant hearing problems while employed there.  Tr. at 112, 114.

Plaintiff also asserts that the ALJ improperly determined that her diabetes was not a severe impairment at Step Two.  ECF Dkt. #14 at 16-17.  Plaintiff cites to medical records showing that she had high blood sugar readings, her diabetes caused pregnancy complications, and she developed kidney problems resulting from uncontrolled diabetes.  *Id.* at 17.  In her decision, the ALJ specifically addressed Plaintiff's diabetes at Step Two, acknowledging that Plaintiff had diabetes and noting that Plaintiff had been hospitalized for diabetic ketoacidosis in May of 2014 because she was not taking her insulin.  Tr. at 114, citing Tr. at 650-651.  The ALJ also cited to instances where doctors noted that Plaintiff reported that she was not checking her blood sugars regularly and she had not taken her diabetes medications for several months because she had forgotten, although she reported that she felt fine during this time.  *Id.* at 114, citing Tr. at 1344.  The ALJ further noted Plaintiff's testimony at the hearing that her blood sugar was high despite using insulin and the doctors were working on it, but she reported having no symptoms related to this condition.  Tr. at 118, citing Tr. at 171-172.  Elsewhere in her decision, the ALJ cited to Dr. Grego's report in 2016 that Plaintiff has to check her blood sugar twice in 8 hours and has to eat or have a snack 1-3 times per 8 hours which would take about 10 minutes to do each time.  *Id.* at 121.

The undersigned questions the ALJ's Step Two determination as to Plaintiff's diabetes. However, even if the ALJ erred in finding that Plaintiff's hearing loss and her diabetes were not severe impairments, the Court should find that the ALJ did not commit reversible error at Step Two since the ALJ found other of Plaintiff's impairments to be severe and considered Plaintiff's hearing loss and diabetes at the subsequent steps of the sequential evaluation process.  At subsequent steps of the sequential evaluation, the ALJ considered Plaintiff's testimony about her diabetes and hearing loss in determining Plaintiff's statements about the severity of these conditions and their impact on her ability to perform work and reviewed doctors' opinions and records as to these conditions.  Thus, the undersigned recommends that even if the Court determines that the ALJ erred in finding Plaintiff's hearing loss and diabetes to be non-severe impairments, the Court should find that the error was not reversible error.

### B.     RFC-HEARING LOSS AND DIABETES

Plaintiff also complains that the ALJ erred in finding that no limitations were required in the ALJ's RFC for her relating to her hearing loss and diabetes.  ECF Dkt. #14-17.  For the following reasons, the undersigned recommends that the Court find that substantial evidence supports the ALJ's determination that Plaintiff's hearing loss did not require limitations in Plaintiff's RFC.  However, the undersigned recommends that the Court decline to address whether limitations were required for Plaintiff's diabetes in the ALJ's RFC because the undersigned is recommending that this case be remanded.

A claimant's RFC is an assessment of the most that a claimant "can still do despite [her] limitations." 20 C.F.R. §§ 416.945(a)(1). An ALJ must consider all of a claimant's impairments and symptoms and the extent to which they are consistent with the objective medical evidence. 20 C.F.R. § 416.945(a)(2)(3).  The claimant bears the responsibility of providing the evidence used to make a RFC finding.  20 C.F.R. §§ 416.945(a)(3).  However, the RFC determination is one reserved for the ALJ. 20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed.Appx. 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."); SSR 96-5p, 1996 WL 374183, at *5.  Social Security Ruling ("SSR") 96-8p provides guidance on assessing RFC in social security cases.  SSR 96-8p.  The Ruling states that the RFC assessment must identify the claimant's functional limitations and restrictions and assess his or her work-related abilities on a function-by-function basis.  *Id*.  Further, it states that the RFC assessment must be based on all of the relevant evidence in the record, including medical history, medical signs and lab findings, the effects of treatment, daily living activity reports, lay evidence, recorded observations, effects of symptoms, evidence from work attempts, the need for a structured living environment and work evaluations*. Id.*

Again, it must be remembered that the standard of review for this Court is to determine whether the ALJ applied the proper legal standards and whether substantial evidence supports the ALJ's determination.  *Abbott*, 905 F.2d at 922.  The undersigned also notes that so long as substantial evidence supports the ALJ's decision, that decision must be upheld even if substantial evidence exists to find to the contrary.  *Key*, 109 F.3d at 273.

-23-

Based upon the undersigned's review of the ALJ's decision, which included citations to the relevant regulations and Social Security Rulings concerning determining a claimant's RFC, the undersigned recommends that the Court find that the ALJ applied the proper legal standards in considering whether Plaintiff's hearing loss required work-related restrictions in her RFC and substantial evidence supports her determination that no such limitations were necessary.

In the instant case, the ALJ cited to the proper regulations and Social Security Rulings in determining Plaintiff's RFC. Tr. at 117-118. She also considered the relevant factors in determining the RFC, including Plaintiff's daily living activities, her statements concerning her impairments and resulting limitations, the medical evidence and doctor reports, and reports from non-medical sources. The ALJ cited to instances where Plaintiff's hearing loss did not cause any limitations, such as at the ALJ's hearing and when Plaintiff participated in the psychological evaluation and interview. Tr. at 114, citing Tr. at 1010. In fact, psychologist Dr. Shamberg noted in the evaluation that while Plaintiff indicated that she had little to no hearing in her right ear, "she appeared to be hearing in normal fashion during this evaluation." *Id*. He reiterated in his report that Plaintiff "could hear this psychologist normally throughout the evaluation." *Id*. at 1011. The ALJ asked Plaintiff about her right ear deafness at the hearing, and Plaintiff responded that she could hear well from her left ear and she was good at reading lips and taught herself to do so when she was 14 or 15 years old. *Id*. at 170. Moreover, when the ALJ asked why Plaintiff could not work, she did not mention her hearing loss and it was not until the ALJ raised the issue that Plaintiff discussed it. *Id*. at 161-162. In addition, the undersigned notes that Plaintiff points to no evidence that a treating physician limited her work abilities based upon her hearing loss, although she cites to the opinions of the two reviewing physicians, who opined that she should be limited to a quieter work environment. *Id*. The ALJ addressed the agency reviewing physicians' opinion that Plaintiff should be limited to a quieter work environment due to her hearing loss. Tr. at 121, citing Tr. at 210, 227. In choosing not to adopt such a limitation, the ALJ relied upon the same reasons that she gave for finding that Plaintiff's hearing loss was a non-severe impairment, which were that she heard well at the hearing and the psychological evaluation, no evidence showed that a hearing aid could not correct the issue, and Plaintiff presented no evidence showing that the hearing loss caused more than a minimal

-24-

limitation. *Id.* While Plaintiff correctly points out that being able to hear well in an interview or a hearing is not the same as being able to hear in an actual work environment, she did not mention that she had problems hearing when she worked on the assembly line in three different departments at Campbell's Soup from 2005-2009 or when she worked as a janitor at the YMCA, or as a cashier at Pilot Travel Centers. *Id.* at 148-160. In fact, she testified that she had last applied for a job the month prior to the hearing. *Id.* at 148, 151-154.

As to Plaintiff's diabetes, the ALJ mainly relied upon the same evidence that she relied upon in determining that Plaintiff's diabetes was not a severe impairment at Step Two. She indicated that Plaintiff testified at the hearing that despite problems controlling her diabetes, Plaintiff reported no symptoms relating to this issue. Tr. at 118. She also noted that Plaintiff testified that she had no problems walking, she could lift 20 to 25 pounds, and she could reach objects without difficulties, but she had problems with kneeling. *Id.* The ALJ also noted Dr. Grego's report that Plaintiff had to check her blood sugar levels twice during the span of eight hours, which took 15 minutes each, and she had to eat or snack 1-3 times per 8 hours, which took about 10 minutes. *Id.* at 121. The ALJ explained that she had provided for the blood sugar checks in her RFC for Plaintiff by including two additional 15-minute breaks for her in conjunction with the regularly scheduled breaks for employees and this should "accommodate her needs." *Id.* The ALJ further indicated that this would not exceed employer allowances as outlined by the VE because "there is no reason the claimant could not do both of these short and simple tasks within one 15-minute break; it is not clear that the doctor meant these time periods could not overlap, and if so, he did not provide any explanation. Secondly, the assessed residual functional capacity provides the claimant with two extra breaks that would accommodate her needs." *Id.*

While the undersigned recommends that the Court find that the ALJ applied the proper legal standards concerning the RFC, the undersigned recommends that the Court refrain from determining whether substantial evidence supports the ALJ's RFC in this case as to Plaintiff's diabetes and bladder-related physical impairments due to issues relating to the ALJ's violation of the treating physician rule. Further explanation is provided *infra*.

### C.      TREATING PHYSICIAN OPINION

The undersigned notes that the ALJ attributed great weight to the September 23, 2016 opinion of Plaintiff's primary care physician, Dr. Grego, and she attributed only some weight to his November 21, 2016 opinion.  Tr. at 120-121.  The ALJ also attributed less than controlling weight to the September 8, 2016 opinion of Dr. Cary, Plaintiff's treating urologist and surgeon.  *Id.* at 120.  For the following reasons, the undersigned recommends that the Court find that the ALJ violated the treating physician rule and remand the instant case to the ALJ for reevaluation and analysis of the opinions of Dr. Cary and Dr. Grego.

An ALJ must give controlling weight to the opinion of a treating source if the ALJ finds that the opinion is well-supported by medically acceptable clinical and diagnostic techniques and not inconsistent with the other substantial evidence in the record.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons"[3] for doing so.  Social Security Rule ("SSR") 96-2p.  The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his or her case is determined, especially when [s]he knows that his[her] treating physician has deemed him[her] disabled and [s]he may therefore "be bewildered when told by an administrative bureaucracy that [s]he is not, unless some reason for the agency's decision is supplied." *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).  Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.*  If an ALJ fails to explain why he or she rejected or discounted the opinions and how those reasons affected the weight afforded to the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243 (citing *Wilson*, 378 F.3d at 544).

---

[3]   The Court notes that the SSA has changed the treating physician rule effective March 27, 2017.  *See* 20 C.F.R. § 416.920.  The SSA will no longer give any specific evidentiary weight to medical opinions, including affording controlling weight to medical opinions.  Rather, the SSA will consider the persuasiveness of medical opinions using the factors specified in their rules  and will consider the supportability and consistency factors as the most important factors.

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *8 (6th Cir. 2010).  The Sixth Circuit has held that an ALJ's failure to identify the reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Parks v. Social Sec. Admin.*, No. 09-6437, 2011 WL 867214, at *7 (6th Cir. 2011) (quoting *Rogers*, 486 F.3d at 243 ).  However, an ALJ need not discuss every piece of evidence in the administrative record so long as he or she considers all of a claimant's medically determinable impairments and the opinion is supported by substantial evidence.  *See* 20 C.F.R. § 404.1545(a)(2); *see also Thacker v. Comm'r of Soc. Sec.*, 99 Fed. App'x 661, 665 (6th Cir. 2004).  Substantial evidence can be "less than a preponderance," but must be adequate for a reasonable mind to accept the ALJ's conclusion.  *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (citation omitted).

In this case, the ALJ discussed the September 8, 2016 opinion of Dr. Cary, Plaintiff's treating urologist and surgeon.  Tr. at 120, citing Tr. at 1217.  She noted that Dr. Cary opined that Plaintiff would have to leave her workstation occasionally to use the restroom, meaning up to 6 times per shift, in addition to regularly scheduled breaks.  *Id*.  The ALJ afforded this portion of Dr. Cary's opinion "only partial weight," citing to Dr. Cary's treatment records which she characterized as the following:

> [the records] indicate the claimant has to catheterize once every five hours, and irrigate the pouch between one and four times per day (9F/9, 15; 16/F5), which is less frequent than the number of breaks indicated in his opinion.  The claimant's testimony that she irrigates four or five times per day is generally consistent with Dr. Cary's treatment records, and contradicts this opinion.  Thus, this opinion cannot be given controlling weight."

*Id*.  The ALJ also cited to Plaintiff's testimony that she irrigated her bladder pouch between 1 and 4 times per day, which was consistent with Dr. Cary's treatment records but inconsistent with his opinion.  *Id*. at 120.

-27-

The undersigned recommends that the Court find that the ALJ failed to provide good reasons for affording less than controlling weight and only partial weight to this part of Dr. Cary's opinion. The ALJ's reliance on Dr. Cary's treatment notes that she found inconsistent with his September 8, 2016 opinion is misplaced.  The first treatment note cited by the ALJ did not mention Plaintiff's draining and irrigation schedule at all, but rather stated that Plaintiff had a period where she was not irrigating the pouch and mucus became stuck in the pouch. Tr. at 947.  The second citation to Dr. Cary's treatment notes by the ALJ does indicate that Plaintiff reported that she was catheterizing every 5 hours and sometimes forgot to catheterize. *Id*. at 954.  This sole treatment record merely repeats what Plaintiff told Dr. Cary concerning her catheterizing once every five hours. *Id*.  The only other support for the ALJ's decision to afford less than controlling weight to Plaintiff's treating urologist and surgeon is Plaintiff's "testimony at the hearing that she irrigates four to five times per day," which the ALJ found "generally consistent with Dr. Cary's treatment records" and a report to the agency psychologist that she drained her pouch every 3-5 hours and irrigated every 8 hours. *Id*. at 120.

The undersigned finds that the ALJ's reliance upon Plaintiff's testimony at the hearing is also insufficient to constitute a good reason for affording less than controlling weight to Dr. Cary's opinion. The testimony given by Plaintiff concerning her draining and irrigating is confusing at best, and was not clarified by the ALJ, who initiated the questioning as to Plaintiff's care for her bladder pouch.  The discussion between the ALJ ("ALJ" below) and Plaintiff ("P" below) transpired as follows:

> ALJ:  All right.  So, now is the time in the hearing where you get to tell me all the reasons why you believe you cannot work at this point so just explain to me what you believe prevents you from working; why do you feel you cannot work?
>
> P:  Well, with me having to irrigate like five times; about four or five times a day.  I also need to be irrigated three times a day and it takes about 20 minutes to do everything because I have to drain and then I have to use an irrigation to flush it out and then I also have to clean up the stuff afterwards and I need a place - - I need a place to be able to put this stuff at and I - - actually, I - -
>
> ALJ:  What stuff do you mean?

-28-

P:      What?

ALJ:    What stuff do you mean?

P:      Well, I have like the saline solution bottles and then I have like a container that has a syringe that you put in it and I need to set that somewhere and then I have to - - I can't do it by myself because I need someone - - I need to hold the catheter in place and then someone has to push the stuff in and then draw it back out and I can't do that at the same time.

Tr. at 161.  A discussion was had about whether Plaintiff needed another person to help her with her catheterization and irrigation and the process of catheterizing and irrigating.  *Id.* at 161-165.  The discussion concerning the bladder pouch then continued:

ALJ:    So, when I reviewed the medical records, it stated that you had to drain your bladder pouch every three to five hours, correct?

P:      Okay.  Yeah.

ALJ:    I'm asking you, do you have to do that every few hours?

P:      That was when I first had it.  When I first got the pouch, it was that way but it's been two years and now - - I didn't know it was five but I've been doing that way but not it's three hours.  We were doing it only once or twice but then, with all the infections that I've been having, we went back to three.

ALJ:    Okay.  So, what I saw in the records and, Counsel, just for your knowledge, I'm talking about what's at 21F; it talked about draining the bladder every three to five hours - -

P:      Yeah.

ALJ:    - - so it talked about the things separately actually.  It talked about in the sense that the draining of the bladder was every three to five hours but the irrigation was only every eight hours.  You're looking at me like I don't know what I'm talking about.  This is what the medical records say.

P:      Okay.

ALJ:    So, I'm just wondering why is it that you are telling me you have to - - instead of just draining every three to five hours - - because let's separate that out for a second.  If you just have to drain and just use the catheter process - -

P:      Yeah.

ALJ:    - - how much time does that take because, that, you can do by yourself, correct?

P:      Yeah.

ALJ:    Yeah.  How much time does that take?

-29-

P:      That takes about five minutes.

ALJ:    Five minutes.  Right.  So, the irrigation, which is what you've explained to me in detail, that's the 25-minute process, correct?

P:      Yeah.

ALJ:    So you're saying your[sic] irrigate every, single time you drain now?

P:      No.

ALJ:    Oh.

P:      No, not - -

ALJ:    I'm sorry.  I just don't understand.  That's what I'm trying to understand.

P:      Yeah.

ALJ:    So I apologize if I misunderstood you.

P:      Okay.  Sorry.

ALJ:    No, no.  It's not you.  I'm just - - I don't - - you're here to explain to me so you drain it every three to five hours.  The irrigation part, that you just explained to me - -

P:      Right.

ALJ:    - - how many time a day do you do that?

P:      Three times.

ALJ:    You do the irrigation three times a day?

P:      Yeah.

ALJ:    How many times do you do the draining part?

P:      About three - - every three to five hours.

ALJ:    Okay.  So you drain more than you - -

P:      Yeah.

ALJ:    - - do the irrigation?

P:      Yeah.  They have it to where I - -

ALJ:    I see.

P:      - - irrigate a lot more; that was in the very beginning when I first had it because I had to have - -

-30-

ALJ:   No, no.  They's actually saying less than what you're telling me.  They're saying every eight hours?

P:   Eight hours?  That would be only like what, twice a day?

ALJ:   Well, I mean, there's 24 hours in a day so, no, that's actually exactly what you're saying; you're saying three times a day.

P:   Three times.  Okay.

ALJ:   Yeah.  So it's the same actually - -

P:   Okay.

ALJ:   - - now that I do the math in my head.  I'm not  - - okay.  So - -

ATTY: And maybe I could just insert, just briefly, the exhibit you're referencing is from her family doctor; it's not the specialist, so, you know, but he - - obviously, it's my obligation to provide you with everybody but he is - - he's a general practitioner, family doctor.

ALJ:   Right.  But she actually testified consistent with it because she's saying she does it three times a day; it says here every eight hours so we're - -

P:   Well, I got confused.  I'm sorry.

ALJ:   You're not confused.

P:   It's like when you say eight hours, it's like  - -

ALJ:   No.  You're not confused.  It's fine.  Okay.  Or maybe you are confused; I shouldn't tell you how you're feeling.  I'm just saying that I'm understanding you.

P:   Right, okay.

*Id.* at 165-168.  The ALJ then changed topics and discussed more about Plaintiff's inability to lift her two year old son.  *Id*. at 168-169.  The ALJ did not again raise, clarify, or seek to confirm with Plaintiff that the number of times per day that Plaintiff drained and irrigated her bladder pouch was consistent with the ALJ's understanding and declaration on the record.  This failure, especially in light of Plaintiff's BIF and her testimony that she was confused about the conversation with the ALJ, negates the ALJ's ability to rely upon Plaintiff's testimony to support her decision to afford less than controlling weight to Dr. Cary's opinion.  Without further clarification and confirmation of the number of times that Plaintiff has to drain her bladder pouch and irrigate it, and the amount of time needed to perform these functions, the undersigned recommends that the Court find that the ALJ failed to provide good reasons for affording less than controlling weight to Dr. Cary's opinion

-31-

concerning Plaintiff's draining and irrigating requirements.

Accordingly, the undersigned recommends that the Court find that the ALJ violated the treating physician rule by failing to provide good reasons for affording less than controlling weight to Plaintiff's treating urologist, Dr. Cary.

### D.  PLAINTIFF'S REMAINING ASSERTIONS OF ERROR RELATING TO HER PHYSICAL IMPAIRMENTS

In light of the undersigned's recommendation that the Court find that the ALJ failed to provide good reasons for attributing less than controlling weight to Dr. Cary's opinion, the undersigned further recommends that the Court refrain from determining Plaintiff's other outstanding claims of error relating to her time spent draining and irrigating her bladder pouch, which includes the weight that the ALJ attributed to Dr. Grego's opinions, Plaintiff's credibility as to the limitations resulting from her bladder pouch, and opinions as to how many times she would be absent and how often she would be off-task due to her catheterization and irrigation.  The ALJ's re-evaluation and analysis of Dr. Cary's opinion on remand may impact her findings on these issues, and the remaining steps in the sequential evaluation, including the ALJ's decision to add only two extra breaks of 15 minutes to the regularly scheduled breaks which were specifically delineated for caring for Plaintiff's diabetes.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 417 (6th Cir. 2011).

### E.  BIF AND PSYCHOLOGICAL IMPAIRMENTS

Plaintiff makes additional assertions concerning the ALJ improperly "assail[ing] her credibility"] on the basis of an inconsistency between two IQ scores she attained in 2012.  ECF Dkt. #14 at 20-21.  The ALJ did note in her Step Three analysis of Plaintiff's IQ scores that Plaintiff scored higher on one IQ test just a month after another IQ test.  Tr. at 117.  She indicated that this casted doubt on the validity of the lower IQ scores.  *Id.*

The undersigned does not agree with Plaintiff's statement that the ALJ "assailed her credibility" on the basis of the conflicting IQ scores and Plaintiff inadequately explains how the ALJ's analysis of her BIF and psychological impairments restricted her RFC beyond that found by the ALJ in her RFC for Plaintiff.  The ALJ found that Plaintiff had the severe impairments of BIF,

affective disorders, depression, and anxiety disorders. Tr. at 113.  She specifically reviewed whether Plaintiff's BIF and her psychological impairments met a Listing or medically equaled a Listing, both singly and in combination with the other impairments.  *Id.* at 115-117.  She specifically reviewed Listings 12.04 for Affective Disorders, 12.05 for Intellectual Disorders, 12.06 for Anxiety Disorders, and 12.11 for Neurodevelopmental Disorders.  *Id.* at 115.  The ALJ also reviewed Plaintiff's testimony that she took special education classes in school, could not pass the test at Campbell's Soup after taking it five times, and that she had help completing social security paperwork and help caring for her son.  *Id.* at 117-118.

The ALJ further reviewed the reports of the Ohio Bureau of Vocational Rehabilitation, and of the psychologists who evaluated Plaintiff and reviewed her records.  Tr. at 124.  The ALJ attributed weight to those reports and provided many limitations in her mental RFC for Plaintiff which were consistent with those reports, including: performing simple, routine, and repetitive tasks, but not at a production rate pace, for example, no assembly line work; simple work-related decisions only; only occasional interactions with supervisors, co-workers and the general public; few changes in the work setting, defined as routine job duties that are performed in a predictable work setting; and infrequent necessary changes that can be adequately and easily explained.  *Id.* at 117.  Without explanation by Plaintiff as to how this RFC was erroneous and not supported by substantial evidence, the undersigned recommends that the Court find no merit to Plaintiff's assertions of error concerning her BIF and psychological impairments as the ALJ conducted a thorough review and analysis of those impairments.

## VII.    CONCLUSION AND RECOMMENDATION

For the following reasons, the undersigned recommends that the Court REVERSE the decision of the ALJ and REMAND this case for re-evaluation and analysis of Dr. Cary's opinion and the evidence relating to Plaintiff's draining and irrigating of her bladder pouch.  The undersigned further recommends that the Court refrain from determining Plaintiff's other assertions of error concerning her diabetes and bladder impairments as the ALJ's re-evaluation on remand may impact the further steps in the sequential evaluation of which Plaintiff complains.  Moreover, the

undersigned recommends that the Court find no merit to Plaintiff's assertions concerning the ALJ's findings and RFC as to her BIF and psychological impairments because the ALJ applied the proper legal standards concerning these impairments and substantial evidence supported her determination on them.

Date: February 22, 2019                          _/s/George J. Limbert_____
                                                         GEORGE J. LIMBERT
                                                  UNITED STATES MAGISTRATE JUDGE

        ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. L.R. 72.3(b).